BALMORAL RACING CLUB, INC., *et al.*, Plaintiffs-Appellees, v. JUDY BAAR TOPINKA, Treasurer, The State of Illinois, *et al.*, Defendants-Appellants.—HAWTHORNE RACE COURSE, INC., Plaintiff-Appellee, v. JUDY BAAR TOPINKA, Treasurer, The State of Illinois, *et al.*, Defendants-Appellants.

First District (5th Division)  Nos. 1—00—3343, 1—00—3344 cons.

Opinion filed September 30, 2002.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Jerald S. Post, Assistant Attorney General, of counsel), for appellants.

Edward M. White and Michael J. Murray, both of Carey, Filter, White & Boland, of Chicago, for appellee Hawthorne Race Course, Inc.

Philip J. Rock and Jeffrey D. Corso, both of Rock, Fusco & Garvey, Ltd., of Chicago, for appellees Balmoral Racing Club, Inc., and Maywood Park Trotting Association, Inc.

JUSTICE BUCKLEY delivered the opinion of the court:

In October 1999, plaintiff Hawthorne Race Course (Hawthorne) filed a complaint against defendants Illinois State Treasurer Judy Baar Topinka, the Department of Revenue (Department), and the Illinois Racing Board (Racing Board) seeking an injunction and declaratory judgment. Hawthorne alleged that a 1999 amendment to the Illinois Horse Racing Act of 1975 (Racing Act) (230 ILCS 5/1 through 55 (West Supp. 1999)) creating a pari-mutuel tax credit was available to racetracks beginning in the year 1999. In December 1999, plaintiffs Balmoral Racing Club (Balmoral) and Maywood Park Trotting Association (Maywood) filed a complaint similar to Hawthorne's complaint. The parties agreed to consolidate the two cases. In April

2000, plaintiffs filed motions for summary judgment in their respective cases, and in May 2000, defendants filed a motion for summary judgment. In August 2000, the circuit court granted summary judgment to plaintiffs.

Defendants appeal, arguing that the circuit court erred in granting summary judgment in favor of plaintiffs. We affirm.

## I. BACKGROUND

On June 25, 1999, the Illinois General Assembly enacted Public Act 91—40, an act relating to gambling. Pub. Act 91—40, eff. June 25, 1999 (1999 Ill. Laws 1184-1257). Contained in the act were several amendments to the Racing Act. Two such amendments included the addition of section 27(a—5), which imposed a "pari-mutuel tax" to begin January 1, 2000, and changes to section 27(a), which was amended to add the termination of the "privilege tax" on December 31, 1999. Pub. Act 91—40, eff. June 25, 1999 (1999 Ill. Laws 1219-20). Another amendment was the addition of section 32.1, which provided for a pari-mutuel tax credit for racetracks awarded live racing dates during a given year. Pub. Act 91—40, eff. June 25, 1999 (1999 Ill. Laws 1234-35) (adding 230 ILCS 5/32.1).

In 1999, Hawthorne was licensed to and did conduct a thoroughbred race meeting at its race course in Stickney, Illinois. Also in 1999, Balmoral and Maywood were licensed to and did conduct harness racing in Balmoral Park, Illinois, and Maywood Park, Illinois, respectively.

Following the effective date of Public Act 91—40, each of the plaintiffs advised the Racing Board that since it had been awarded live racing dates in 1999, it was entitled to a credit against its privilege tax in 1999, as established by section 32.1. 230 ILCS 5/32.1 (West Supp. 1999). The Racing Board denied plaintiffs' requests, and plaintiffs proceeded to make a payment of the privilege tax under protest pursuant to section 2(a) of the State Employees and Money Disposition Act. 30 ILCS 230/2(a) (West 1998).

In October 1999, Hawthorne filed a complaint in the circuit court against defendants seeking an injunction and declaratory judgment. It alleged that in 1998 it paid $1,229,048.44 in real estate taxes. Hawthorne alleged that section 32.1 of the Racing Act provided a pari-mutuel tax credit, which the General Assembly intended to be available in 1999 and, thus, it was entitled to a 50% credit against its 1999 privilege tax. Hawthorne also sought a temporary restraining order and a preliminary injunction to prohibit transfer of funds paid under protest. In December 1999, Balmoral and Maywood filed a complaint alleging the same use of the pari-mutuel tax credit as Hawthorne. Balmoral and Maywood paid in 1998 real estate taxes in the amounts of

$163,317.02 and $766,186.56, respectively. The circuit court issued temporary restraining orders in both cases. The parties filed an agreed motion to consolidate both cases, which the court granted. In February 2000, the court granted a preliminary injunction.

In April 2000, plaintiffs filed motions for summary judgment in their respective cases, and in May 2000, defendants filed a motion for summary judgment. In August 2000, the circuit court granted plaintiffs' motions for summary judgment, finding:

"1. Plaintiffs, by virtue of 230 ILCS 5/32.1, are entitled to receive, in 1999, a credit against taxes assessed on pari-mutuel handle under 230 ILCS 5/27(a) in the year 1999;

2. Plaintiffs have made payments of taxes under protest pursuant to 30 ILCS 230/2(a);

3. There is no genuine issue of material fact and [p]laintiffs are entitled to summary judgment as a matter of law."

The court entered judgment in favor of plaintiffs and awarded $614,529.22 to Hawthorne, $81,658.51 to Balmoral, and $383,093.28 to Maywood, plus interest. In September 2000, a modified order for summary judgment was entered, noting that the interest was to run from the date of deposit of the disputed funds into the protest fund.

This appeal followed.

## II. ANALYSIS

On appeal, defendants argue that the trial court erred in granting summary judgment in favor of plaintiffs. Specifically, defendants assert that the pari-mutuel tax credit provided by section 32.1 first became available in the 2000 tax year, which is the same tax year that section 27(a—5) first imposed the pari-mutuel tax. We disagree.

■■ The standard of review in this case is *de novo* for two reasons. Since "the question presented is one of law, a reviewing court determines it independently of the trial court's judgment." *In re Lawrence M.*, 172 Ill. 2d 523, 526 (1996). Additionally, we review a circuit court's grant of summary judgment *de novo. Ragan v. Columbia Mutual Insurance Co.*, 183 Ill. 2d 342, 349 (1998). Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 1998).

■ Ordinarily, the taxing authority has the burden of proof regarding a taxpayer's liability to the government. *Balla v. Department of Revenue*, 96 Ill. App. 3d 293, 295 (1981). However, when a taxpayer claims that he is exempt from a particular tax, or where he seeks to take advantage of deductions or credits allowed by statute, the burden of proof is on the taxpayer. Statutes granting such privileges are to be

strictly construed in favor of taxation. *Balla*, 96 Ill. App. 3d at 295. In this case, plaintiffs carry the burden of proof because they are seeking to take advantage of a tax credit.

■ Public Act 91—40 added section 32.1, which imposed a credit for pari-mutuel taxes as follows:

"In order to encourage new investment in Illinois racetrack facilities and mitigate differing real estate tax burdens among all racetracks, the licensees affiliated or associated with each racetrack that has been awarded live racing dates in the current year shall receive an immediate pari-mutuel tax credit in an amount equal to the greater of (i) 50% of the amount of the real estate taxes paid in the prior year attributable to that racetrack, or (ii) the amount by which the real estate taxes paid in the prior year attributable to that racetrack exceeds 60% of the average real estate taxes paid in the prior year for all racetracks awarded live horse racing meets in the current year.

Each year, regardless of whether the organization licensee conducted live racing in the year of certification, the [Racing] Board shall certify in writing, prior to December 31, the real estate taxes paid in that year for each racetrack and the amount of the pari-mutuel tax credit that each organization licensee, intertrack wagering licensee, and intertrack wagering location licensee that derives its license from such racetrack is entitled in the succeeding calendar year. The real estate taxes considered under this [s]ection for any racetrack shall be those taxes on the real estate parcels and related facilities used to conduct a horse race meeting and inter-track wagering at such racetrack under this Act. In no event shall the amount of the tax credit under this [s]ection exceed the amount of pari-mutuel taxes otherwise calculated under this Act. The amount of the tax credit under this [s]ection shall be retained by each licensee and shall not be subject to any reallocation or further distribution under this Act. The [Racing] Board may promulgate emergency rules to implement this [s]ection." 230 ILCS 5/32.1 (West Supp. 1999).

Plaintiffs assert that the legislature intended for the pari-mutuel tax credit to be available for use directly after the effective date in June 1999 while defendants contend that the credit was to be available beginning in the 2000 tax year. We agree with plaintiffs.

■ The cardinal rule of statutory interpretation, to which all other rules are subordinate, is to ascertain and give effect to the intent of the legislature. *People v. Maggette*, 195 Ill. 2d 336, 348 (2001). In determining the legislative intent, a court should first consider the statutory language. This is the best means of determining the legislative intent. *Maggette*, 195 Ill. 2d at 348. A court must consider the

entire statute and interpret each of its relevant parts together. If legislative intent can be ascertained from the statute's plain language, that intent must prevail without resort to other interpretive aids. *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997).

Plaintiffs contend that section 32.1 is ambiguous in its use of the words "current year" and "immediate." They claim that the reference to "current year" meant the year the statute became effective; in this case, 1999, "immediate" meant that the qualifying racetracks were entitled to the credit immediately upon the statute's effective date. While defendants argue that "current year" does not mean 1999 but, rather, should be read that beginning in 2000, "current year" means the current calendar year. Defendants also assert that "immediate" means without intervention, and in this context it means that the tax credit will be available as soon as the tax obligation arises.

■ A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses, thus warranting the consideration of other sources to ascertain the legislative intent. *Advincula v. United Blood Services*, 176 Ill. 2d 1, 18 (1996). In this case, the context in which "current year" and "immediate" are used creates an ambiguity. The trial court resolved this ambiguity by determining that the legislature's use of these words reflected its intent for the tax credit to be available in the 1999 tax year. We agree.

■ In reading section 32.1 in its entirety, defendants' interpretation would render the statute redundant because the second paragraph details the same function that defendants claim the first paragraph outlines. Statutes should be construed, if possible, so that no term is rendered superfluous or meaningless. *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 397 (1994). We will not interpret the statute in a manner that creates a redundancy.

This intention by the legislature is further supported by the fact that the legislature, in drafting section 32.1, did not indicate an effective date other than the effective date for Public Act 91—40, which was June 25, 1999. In several additions and amendments, the legislature incorporated an effective date of January 1, 2000. The most significant example is the inclusion of a January 1, 2000, effective date for section 27(a—5), which imposed the pari-mutuel tax. Clearly, the legislature did not intend for the pari-mutuel tax credit to apply only to the pari-mutuel tax when it specifically stated the pari-mutuel tax was not to become effective until January 1, 2000, but did not make any such date restrictions on the pari-mutuel tax credit. We decline the invitation urged by defendants to stray from the clear statutory language.

Additionally, the trial court found that the use of the words "pari-mutuel tax" did not demonstrate that the legislative intent behind the credit was for it to be unavailable during the "current year" of 1999. In support of its finding, the court pointed out several instances where the legislature used the terms "privilege tax" and "pari-mutuel tax" interchangeably in legislation and in debate.

In resolving the ambiguity in the statutory language, we look to extrinsic sources to ascertain the legislative intent. Where a statute is unclear, a court may consider legislative history in order to establish legislative intent. Such extrinsic sources as legislative debates may be relevant to the inquiry. *People v. Lowe*, 153 Ill. 2d 195, 203 (1992).

The legislative debates over Public Act 91—40 provide guidance as to the legislative intent. Senator Dillard discussed the jobs involved in this industry and the tax burdens upon it: "So, [49,500] jobs are at stake, with over four billion dollars a year in economic activity, for better or worse, coming from this particular industry. Illinois has the highest pari-mutuel tax in the United States of America, and we are more than twice the national average." 91st Ill. Gen. Assem., Senate Proceedings, May 25, 1999, at 8 (statements of Senator Dillard). Representative Cross discussed the change in tax, in that the bill "reduces the pari-mutuel tax, from 3 to 1.5%, \*\*\* which is about the national average." 91st Ill. Gen. Assem., House Proceedings, May 21, 1999, at 205 (statements of Representative Cross). He also stated a specific goal of the bill was to "provide a substantial infusion of new revenue into the industry with the hope and the intention of both preserve [*sic*] and enhance [*sic*] quality of horse racing in Illinois." 91st Ill. Gen. Assem., House Proceedings, May 21, 1999, at 205 (statements of Representative Cross).

Based on these debates, we find that the legislative intent was to provide instant help to the horse racing industry by reducing the tax burden on this struggling entity. The General Assembly's paramount goal was to help the industry with the lower tax rate and the tax credit. Also, the statements of both Senator Dillard and Representative Cross refer to the pari-mutuel tax in a context where the privilege tax was the actual tax in existence. These statements help to show that the legislature did consider the "privilege tax" and the "pari-mutuel tax" to be the same tax. Also, we note that both taxes are a privilege tax on pari-mutuel handle, which is all monies bet at the race track from all sources, including off-track and simulcast betting. The change of the name from a privilege tax to a pari-mutuel tax does not change the fact that the tax is a privilege tax on the privilege of conducting horse racing.

Another extrinsic tool to aid in the interpretation of an ambiguous

statute is to construe *in pari materia* with other statutes relating to like subjects. The trial court conducted this analysis to help determine legislative intent and found that the legislature for many years used the terms "pari-mutuel" and "privilege" interchangeably and intended the same tax with either term. Specifically, the court considered section 8.25e(a) of the State Finance Act (30 ILCS 105/1 through 36 (West 1998)), where it stated:

> "The State Comptroller and the State Treasurer shall automatically transfer on the first day of each month, beginning February 1, 1988, from the General Revenue Fund to each of the funds supplemented by the *pari-mutuel tax*, pursuant to [s]ection 28 of the [Racing Act], an amount equal to (i) the amount of *pari-mutuel tax* deposited into such fund during the month in fiscal year 1986 which corresponds to the month preceding such transfer, minus (ii) the amount of *pari-mutuel tax* deposited into such fund during the month preceding such transfer ***." (Emphasis added.) 30 ILCS 105/8.25e(a) (West 1998).

This section refers to a pari-mutuel tax imposed by the Racing Act. However, at the time section 8.25e was drafted, the Racing Act did not contain a pari-mutuel tax, but instead had a privilege tax. According to defendants' interpretation, the 86th General Assembly was referring to a tax that did not exist. Rather, we agree with the conclusion of the trial court and consider this as further evidence that the legislature intended for "pari-mutuel tax" and "privilege tax" to refer to the same tax. Accordingly, we find that the legislature intended the pari-mutuel tax credit to apply to the privilege tax in 1999.

## III. CONCLUSION

Based on the foregoing analysis, we affirm the decision of the trial court.

Affirmed.

CAMPBELL, P.J., and REID, J., concur.